UNITED STATES of America,
Plaintiff–Appellee,

v.

Baldemar BERMEA, Rogelio Bermea,
Lorenzo Rodriguez, Manuel Garcia, Ho-
norio Garza, Matilde Perez, Guadalupe
Bermea, Enrique Avalos and Teodoro
Pedraza, Defendants–Appellants.

No. 92–7349.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1994.

David Almaraz (court appointed counsel), Laredo, TX, for Matilde Perez.

Allen Cazier, San Antonio, TX, for Baldemar Bermea.

Allen Cazier, San Antonio, TX, for Guadalupe Bermea.

C.J. Quintanilla (court appointed counsel), McAllen, TX, for Manuel Garcia.

David Diaz, Corpus Christi, TX, for Enrique Avalos.

David Diaz, Corpus Christi, TX, for Teodoro Pedraza.

L. Aron Pena, Edinburg, TX, for Lorenzo Rodriguez & Rogelio Bermea.

Heriberto Medrano, Harlingen, TX, for Honorio Garza.

Cynthia Young, Dept. of Justice, Crim. Div., Washington, DC, Paula Offenhauser, Asst. U.S. Atty., Gaynell Griffin Jones, U.S. Atty., Houston, TX, for appellee.

Before GOLDBERG, KING and WIENER, Circuit Judges.

KING, Circuit Judge:

This case presents a myriad of issues common to appeals of drug conspiracy convictions. Two less common issues are difficult. One such issue concerns the failure of the district court to conduct individual voir dire of the members of the jury following prejudicial midtrial publicity. The other such issue concerns the treatment of a pending *James* motion, ultimately ruled on at trial, under the Speedy Trial Act.

## I. BACKGROUND

### A. FACTS

The appellants in this case were charged with participating in one or both of two conspiracies to possess marijuana with the intent to distribute. The first of these conspiracies, lasting from late 1987 to mid–1988, allegedly involved eight persons, including appellants Matilde Perez, Manuel Garcia, Honorio Garza, Enrique Avalos, Teodoro Pedraza, and Lorenzo Rodriguez. The second conspiracy lasted from late 1988 through early 1989, and it allegedly involved seven persons, including appellants Perez, Garza, Rogelio Bermea, Baldemar Bermea, and Guadalupe Bermea.

### 1. *The First Conspiracy*

Jaime Rios Gonzalez, an informant who began working for the Drug Enforcement Administration (DEA) and other government agencies in 1988, testified at trial as follows. In 1988, Gonzalez was staying at a ranch owned by Garcia, getting paid about $200 per week for doing "mostly nothing." (Other testimony at trial indicates that Garcia's ranch was located just north of Mission, Texas, which is in Hidalgo County near the border with Mexico.) Avalos and Rodriguez also worked at Garcia's ranch while Gonzalez was there, and Gonzalez identified Avalos as Garcia's closest associate.

At some point, Garcia revealed to Gonzalez that he owned a grain trailer with a secret compartment used for carrying large quantities of marijuana. Garza, a constable of Starr County, Texas (adjacent to Hidalgo County), and Perez came to Garcia's ranch on one occasion, and Gonzalez overheard Perez tell Garcia not to let his workers "get lost" because he had some work coming up. A little later, Garcia told Gonzalez and other workers that Perez and Garza would soon be providing a "load." A few days later, Gonzalez and Rodriguez went to a different ranch owned by Carlos Gomez, where they met Garcia, Garza, Avalos, and several other men. That night, which was sometime in July 1988, Gonzalez, Avalos, Rodriguez, Garcia, and the others loaded bundles of marijuana into the secret compartment in Garcia's grain trailer; Gonzales was told by Avalos and Garcia that the load contained over 1800 pounds. Although Garza was not present during the loading of the marijuana, Garcia told Gonzalez that Garza and Perez had supplied the marijuana.

The trailer containing the marijuana remained on the Gomez ranch for at least two weeks before Garcia gave the order to move it. Another of Garcia's employees, Pepe Villarreal, drove the tractor-trailer, while Gonzalez accompanied Avalos and Rodriguez in another vehicle. Ultimately the tractor-trailer was taken to the home of one "Shorty" Pedraza, which Gonzalez described as being in the country near Giddings, Texas. There Gonzalez, Villarreal, Rodriguez, Avalos, and Teodoro Pedraza unloaded the marijuana and stored it in a shed on Shorty Pedraza's property. Within the next few days, someone identified as "Ruben" arrived with Garza in a truck equipped with a U–Haul trailer, and

the men loaded 600 pounds of marijuana (apparently into the U–Haul). Gonzalez saw Ruben pay Garza an indeterminate amount of money, and Gonzalez then left with Villarreal to return to Garcia's ranch. A few days later, Gonzales saw Perez and Garza come to Garcia's ranch and deliver four plastic sacks containing money to one of Garcia's henchmen. Garcia paid Gonzalez $700 for his work. Gonzalez stayed with Garcia through August of 1988. In September of 1988 he began working for the DEA.

Gonzalez's testimony was corroborated in part by Carlos Gomez, who testified at trial as a government witness. Gomez testified that Garcia used Gomez's ranch as a site for loading marijuana into the secret compartment of Garcia's trailer ten or twelve times between January and August 1988. Gomez also verified that Perez brought marijuana to the ranch on two or three occasions and that Gonzalez had been at the ranch to load marijuana with Garcia's men on one occasion.

### 2. *The Second Conspiracy*

Gonzalez testified that, near the end of his association with Garcia, Garcia became upset with his cousins, the brothers Guadalupe, Baldemar, and Rogelio Bermea. Garcia told Gonzalez that the Bermeas had stolen his secret compartment design and built their own trailer with a secret compartment and that he was afraid that the Bermeas would get caught by law enforcement officers and thus ruin the usefulness of his design.

Gonzalez was recruited to be a driver for the Bermeas by Guadalupe and Baldemar Bermea in October of 1988. He went to a ranch, apparently owned by Guadalupe and Baldemar Bermea, in late October or early November 1988. Some time later the Bermeas' tractor-trailer arrived, and marijuana was brought to the ranch in a van by Perez and an unknown man. Perez told Gonzalez that he and Garza had decided to start working with the Bermeas because they could get a "cheaper rate" with the Bermeas than they could with Garcia. While Rogelio, Guadalupe, and Baldemar Bermea kept a lookout, Gonzalez and others loaded marijuana into the secret compartment in the Bermeas' trailer, which Gonzalez described as "identi-cal" to Garcia's compartment. The next day, Gonzalez left the ranch driving the tractor-trailer. He contacted the DEA agents with whom he had been working, and the agents arrested Rogelio Bermea, who was following Gonzalez in a separate vehicle, along the way. Gonzalez continued with the shipment and met Baldemar Bermea a little later, but Baldemar Bermea apparently abandoned Gonzalez when Texas state highway troopers began to follow Gonzalez. Eventually Gonzalez was "arrested" by the DEA and the Hays County Sheriff's Department. He helped the law enforcement officers unload the marijuana, which turned out to weigh a little over 1300 pounds.

After Gonzalez turned the Bermeas' tractor-trailer over to the DEA, he returned to the Bermeas' ranch and told them that he had left the tractor-trailer at a certain truck stop with the key under the floor mat. Guadalupe Bermea told him that the tractor-trailer was nowhere to be found and then paid him $500 and told him to "get lost for a while." Later, Baldemar Bermea told Gonzalez that Garza and his brother had put a price on his head.

Another government witness was Juan Teodosa Solis, who testified to the following events. Solis was recruited by Rogelio Bermea to drive a second tractor-trailer with a secret compartment in January 1989. Solis drove three shipments of marijuana for the Bermeas successfully, and Perez accompanied him on each of these trips. On the second trip, Solis overheard Perez talking to someone on the phone that he referred to as "Honorio." Additionally, while Solis was working for the Bermeas, he was told by Guadalupe Bermea that Rogelio and Baldemar Bermea were making plans with "Honorio" to transport another load of marijuana. On a fourth trip, in early March 1989, Solis was arrested, and it appears that he pleaded guilty to federal drug charges and was sentenced to seventy months in prison. A DEA agent testified at trial that Solis was transporting about 1100 pounds of marijuana at the time he was arrested.

### B. PROCEDURAL HISTORY

The final superseding indictment against the appellants contained four counts. The

first count charged that from December 1987 through July 1988, Perez, Garcia, Garza, Avalos, Pedraza, Rodriguez, and two others not before this court conspired to possess more than 100 kilograms of marijuana with the intent to distribute in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). The second count charged that from November 1988 through May 1989, Perez, Garza, Rogelio Bermea, Baldemar Bermea, Guadalupe Bermea, and two others not before this court conspired to possess more than 100 kilograms of marijuana with the intent to distribute, also in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). The third count charged Perez, Rogelio Bermea, Baldemar Bermea, Guadalupe Bermea, and two others not before this court with possession of between 100 and 1000 kilograms of marijuana with the intent to distribute on or about November 16, 1988, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2. The final count charged Perez, Rogelio Bermea, Baldemar Bermea, and Guadalupe Bermea with possession of between 100 and 1000 kilograms of marijuana with the intent to distribute on or about March 3, 1989, also in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and 18 U.S.C. § 2.

After a two-week trial, the jury returned its verdicts. Perez was found guilty on counts one, two, and three and was found not guilty on count four. Garza was found guilty on counts one and two. Garcia, Avalos, Pedraza, and Rodriguez were found guilty on count one. Rogelio and Guadalupe Bermea were found guilty on counts two, three, and four. Baldemar Bermea was found guilty on count two and was found not guilty on counts three and four.

The appellants were sentenced under the sentencing guidelines to terms of imprisonment as follows. Perez, Garcia, Garza, and Rogelio Bermea were sentenced to 151 months. Guadalupe Bermea was sentenced to 135 months. Avalos was sentenced to 108 months. Baldemar Bermea was sentenced to 100 months. Pedraza was sentenced to 97 months, and Rodriguez was sentenced to 92 months. An additional term of four years supervised release was imposed on each appellant as well. These appeals followed.

## II. SUFFICIENCY OF THE EVIDENCE

■ Several of the appellants have raised claims that the evidence was insufficient to support the jury verdicts. The scope of our review of the sufficiency of the evidence after conviction by a jury is narrow. We must affirm if a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994). We must consider the evidence in the light most favorable to the government, including all reasonable inferences that can be drawn from the evidence. *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir.), cert. denied, 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *Id.* at 254.

### A. OFFENSE ELEMENTS AND PAID INFORMANTS

■ The sufficiency challenges raised in this appeal appear to be limited to the conspiracy convictions. In order to prove that a defendant committed the crime of conspiracy to possess narcotics with intent to distribute, the government must prove that (1) a conspiracy to possess narcotics with intent to distribute existed, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy. *United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988); see *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 2150, 128 L.Ed.2d 876 (1994). No proof of an overt act is required. *Hernandez–Palacios*, 838 F.2d at 1348; *Cacace v. United States*, 590 F.2d 1339, 1340 (5th Cir.1979); *United States v. Palacios*, 556 F.2d 1359, 1364 n. 9 (5th Cir.1977). But see *United States v. Shabani*, 993 F.2d 1419 (9th Cir.1993) (holding that the elements of a drug conspiracy under 21 U.S.C. § 846 do include an overt

act requirement), *cert. granted,* —— U.S. ——, 114 S.Ct. 1047, 127 L.Ed.2d 370 (1994). Among the factors that may be considered by the factfinder in determining whether a defendant is guilty of committing a drug conspiracy crime are "concert of action," presence among or association with drug conspirators, and "[e]vasive and erratic behavior." *Cardenas,* 9 F.3d at 1157. Of course, mere presence or association alone cannot suffice to establish that a person has voluntarily joined a conspiracy. *United States v. Magee,* 821 F.2d 234, 239 (5th Cir.1987).

■ The government's evidence at trial consisted largely of the testimony of Jaime Gonzalez, who was a paid informant, Carlos Gomez, who had reached an agreement to cooperate with the government in exchange for dismissal of an indictment against his wife and who was paid for his expenses in testifying, and Juan Solis, who testified that he had been offered a reward if he cooperated in future civil forfeiture proceedings brought by the government. Although the credibility of witnesses who receive consideration in exchange for their cooperation or testimony may suffer from that fact, we have concluded that "it is up to the jury to evaluate the credibility of a compensated witness." *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) (en banc) (overruling *Williamson v. United States,* 311 F.2d 441 (5th Cir.1962), *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965)), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). We have cautioned that procedural safeguards should be observed when paid informant testimony is used by the government. The government must not use or encourage the use of perjured testimony; the government must completely and timely disclose the fee arrangement to the accused in accordance with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); the accused must be given an adequate opportunity to cross-examine the informant and government agents about any agreement to compensate the witness; and the trial court should give a special jury instruction pointing out the suspect credibility of paid witnesses. *Cervantes–Pacheco,* 826 F.2d at 315–16. We note that the district court did give such a cautionary jury instruction, and that no defendant complains that he was not allowed to conduct adequate cross-examination regarding any agreements between the government and its witnesses.

With these rules in mind, we evaluate the appellants' insufficiency claims.

### B. Manuel Garcia

■ Garcia's claim that the evidence was insufficient to sustain his conspiracy conviction is without merit. His argument amounts to little more than an attack on the credibility of Gonzalez and Gomez because these government witnesses received consideration from the government in exchange for their cooperation and testimony. We have repeatedly stated that the jury is the final arbiter of the credibility of witnesses. *United States v. Restrepo,* 994 F.2d 173, 182 (5th Cir.1993). We have held that a guilty verdict may be sustained if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face. *United States v. Gadison,* 8 F.3d 186, 190 (5th Cir.1993); *United States v. Hernandez,* 962 F.2d 1152, 1157 (5th Cir.1992). Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature. *Gadison,* 8 F.3d at 190; *United States v. Hoskins,* 628 F.2d 295, 297 (5th Cir.), *cert. denied,* 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 249 (1980).

The testimony of Gomez and Gonzalez was not incredible or insubstantial on its face. Indeed, Gomez's testimony tended to corroborate Gonzalez's testimony regarding the loading of Garcia's grain trailer at Gomez's ranch in July 1988. A reasonable jury could have credited their testimony, which included Garcia as an important member of the first conspiracy. We therefore reject Garcia's claim.

### C. Honorio Garza

Garza was convicted of both conspiracies alleged in the indictment. The evidence ad-

duced against him at trial consisted of the following.

With respect to the first conspiracy, Gonzalez testified that Garcia told him and Garcia's other workers that "Matilde and Honorio" were going to bring them "a load" a few days before the load of marijuana actually arrived at Gomez's ranch. Garza was present at Gomez's ranch during the day before the loading operation commenced, but Gonzalez did not testify that Garza was present during the loading. Gonzalez also testified that Garcia told him that Garza and Perez were the sources of the marijuana. Garza was identified as accompanying Ruben to Shorty Pedraza's home in Giddings, where Ruben picked up 600 pounds of marijuana and paid Garza an indeterminate amount of money from a briefcase. Garza points out that Gonzalez's testimony is somewhat unclear regarding this transaction; although Gonzalez testified that the transaction occurred in Giddings, the prosecutor's questions strangely begin to refer to a "man in New Braunfels[, Texas]" in the middle of Gonzalez's testimony. The prosecutor may have been referring to the buyer that Gonzalez knew only as "Ruben," but the record does not explicitly draw a connection between the two references.

With respect to the second conspiracy, Gonzalez testified as follows. Soon after Gonzalez went to work for the Bermeas, Perez and an unknown man delivered a van loaded with marijuana to Guadalupe and Baldemar Bermea's ranch. Gonzalez talked with Perez after the marijuana was unloaded, and Perez told Gonzalez that he and his "compadre" Honorio had decided to start using the Bermeas because they had a cheaper rate. After Gonzalez turned the Bermeas' trailer over to law enforcement officers, Baldemar Bermea told him that "Los Nencos," a nickname for Garza and his brother, had put a price on Gonzalez's head. Witness Solis also connected Garza to the second conspiracy in his testimony. Solis testified that he overheard Perez talking on a phone to "Honorio" during two of Solis's trips as a driver for the Bermeas. Perez told Solis that he was calling people in "the Valley" to assure them that everything was going

smoothly. On another occasion Solis was told by Guadalupe Bermea that Rogelio and Baldemar Bermea were making plans with Garza for another run.

The evidence was clearly sufficient to support a finding that Garza was guilty as to the first conspiracy; Gonzalez's testimony specifically tied Garza to the drug transaction conducted in Giddings. Although the evidence tying Garza to the second conspiracy is significantly weaker, we have held that "[o]nly slight evidence is needed to connect an individual to an illegal conspiracy once the United States has produced evidence of that conspiracy." *United States v. Vaquero*, 997 F.2d 78, 82 (5th Cir.) (citing *United States v. Duncan*, 919 F.2d 981, 991 (5th Cir.1990), cert. denied, 500 U.S. 926, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991)), cert. denied, —— U.S. ——, 114 S.Ct. 614, 126 L.Ed.2d 578 (1993). The United States more than sufficiently proved the existence of the second conspiracy; the evidence connecting Garza to that conspiracy, although not overwhelming, sufficiently supports the inference that he was involved in that conspiracy in a somewhat removed position of authority.

## D. ENRIQUE AVALOS

Avalos challenges the sufficiency of the evidence to support his conviction for participation in the first conspiracy. His protests that the evidence shows "mere presence" at the scene of conspiratorial activity, however, are without merit. Gonzalez testified not only that Avalos was often present at Garcia's ranch, but also that Avalos was Garcia's closest associate. Additionally, Avalos was identified by Gonzalez as one of the men who helped load the marijuana into the secret compartment in Garcia's grain trailer at Gomez's ranch in July of 1988 and who helped unload the marijuana at Shorty Pedraza's home. Like his co-appellants, Avalos makes much of the fact that the government's main witnesses were paid or otherwise compensated for their testimony and cooperation, but this fact was for the jury to consider in weighing the credibility of the witnesses. We will not second-guess the jury's determination.

### E. Teodoro Pedraza

██ Although the government's evidence against Teodoro Pedraza was not as extensive as its evidence against some of his codefendants, we conclude that Pedraza's sufficiency challenge is also without merit. Gonzalez identified Pedraza as one of the men who converged at Shorty Pedraza's home and helped unload the marijuana from Garcia's trailer. Gonzalez also testified that Pedraza was part owner of the truck used during the first conspiracy and that Pedraza and Garcia argued on one occasion when Pedraza wanted Garcia to finish paying Pedraza for the truck. Thus, Gonzalez's testimony, if believed, established more than Pedraza's mere presence at the scene of conspiratorial activity. Pedraza's complaint that the jury could not have rationally convicted him and at the same time acquitted Shorty Pedraza is without merit. *See United States v. Zuniga–Salinas,* 952 F.2d 876, 877 (5th Cir.1992) (en banc) (holding that a verdict convicting one alleged conspirator can stand even if the jury acquits the sole alleged coconspirator). Because a rational jury could have found that Pedraza actively participated in the first conspiracy, we conclude that the evidence supporting his conviction was sufficient.

### F. Lorenzo Rodriguez

██ Rodriguez's argument that the evidence implicating him in the first conspiracy was insufficient to support his conviction is without merit. Gonzalez's testimony established Rodriguez's frequent presence at Garcia's ranch before the July 1988 marijuana shipment as well as Rodriguez's participation in both the loading of marijuana into Garcia's trailer at Gomez's ranch and the unloading of the marijuana at Shorty Pedraza's home near Giddings. Gomez also testified to Rodriguez's presence at his ranch when the July 1988 shipment was loaded into Garcia's trailer. The fact that Gonzalez and Gomez generally referred to Rodriguez as "Lencho," the name listed in the indictment as an "a/k/a" for Rodriguez, does not reduce the evidentiary weight of their testimony or in-court identifications of Rodriguez, as Rodriguez seems to argue.

### G. Rogelio Bermea

██ Rogelio Bermea contends that the district court erred in denying his motion for acquittal because the evidence was insufficient to distinguish him from his relatives who were also on trial. We disagree. According to Gonzalez, Rogelio Bermea was present at the Bermea ranch when the marijuana was loaded into the truck that Gonzalez was to drive, and Rogelio Bermea also met Gonzalez at a convenience store during the shipment. Witness Solis also affirmatively identified Rogelio Bermea as the person who recruited him to drive loads of marijuana for the Bermeas and opined that Rogelio Bermea was the "boss man" of the conspiracy. This evidence, taken as a whole, was sufficient to support Rogelio Bermea's conspiracy conviction.

### H. Baldemar Bermea

██ Baldemar Bermea's sufficiency of the evidence challenge, like that of the other appellants, is without merit. He was convicted only for his membership in the second conspiracy alleged in the indictment. Gonzalez connected Baldemar Bermea to the conspiracy by testifying that he was recruited by Guadalupe and Baldemar Bermea, that Baldemar Bermea accompanied him part of the way during the shipment that he drove and tried to warn him that Texas highway patrol officers were following him, and that Baldemar Bermea was the person who warned him that a price had been put on his head. Although Gonzalez's in-court identification of Baldemar Bermea was not recognized by the district court and is thus not clear to this court on appeal, Solis did make a clear in-court identification of Baldemar Bermea. Solis's testimony also established Baldemar Bermea's involvement in the second conspiracy. According to Solis, Baldemar Bermea went with him to pick up the truck that Solis used to transport marijuana and occasionally contacted him when there was a load of marijuana ready to be shipped. Baldemar Bermea also assured Solis that if he were arrested, the Bermeas would help him and his family financially. The evidence

against Baldemar Bermea was sufficient to support his conviction.

## III. MIDTRIAL PUBLICITY

Garcia and Garza contend that they are entitled to reversal of their convictions because they were unfairly prejudiced by extensive publicity that occurred during the trial.

### A. FACTS

Most of the publicity complained of by Garcia and Garza consisted of articles published in a local newspaper, the *McAllen Monitor*. The trial lasted from January 15–29, 1992. On Saturday, January 18, the *Monitor* ran a story entitled "Official's drug trial underway," detailing Gonzalez's testimony and describing the case as one "involving former Starr County Constable Honorio Garza and 11 other defendants." The next article cited by Garza and Garcia was entitled "Witness details drug ring operation" and summarized Gomez's testimony. The next article was entitled "Testimony implicates constable," and it detailed the testimony of Solis, including his belief that Perez contacted Garza by telephone during marijuana shipments. On January 23, the *Monitor* ran an article entitled "Witness says he was offered bribe not to testify." The article briefly described testimony by Solis under cross-examination by Garza's attorney that Solis's brother had come to visit Solis in Starr County jail in September of 1991 and told Solis that he was sent by Garza to offer him money not to testify. The next article was entitled "Jurors allowed to see evidence over objections." The article stated that income tax records, weapons, cash, and jewelry had been seized in raids on the homes of some of the defendants and that the trial judge had admitted some of the articles into evidence. Relying in part on a statement by the lead prosecutor, the article further stated that one of the defendants, Eleazar Bermea, had pleaded guilty to misprision of a felony and stated in the plea agreement that "he knew there was a marijuana-trafficking conspiracy, that he allowed his home to be used for telephone conversations between conspirators, and that he did not alert authorities

about criminal acts." Two other articles complained of describe the final day of testimony in the case and mention in passing that jury deliberations had begun.

The other source of the publicity complained of by Garcia and Garza was an episode of the nationally televised news program *Street Stories* that aired the evening of January 23, 1992, in the midst of the trial. Garza has provided a transcript of that episode to this court in his record excerpts. A segment of that episode focused on the marijuana smuggling trade in the Rio Grande Valley, referring specifically to Starr County as a "smuggler's paradise" and including footage of an unidentified informant who asserted that forty percent of Starr County's law enforcement personnel were involved in the drug trade. Apparently photographs of Garza were included in the segment, and the program reported that Garza had been indicted and that his trial was pending. The appellants also claim that Garza was shown on the program in handcuffs, although this cannot be verified from the transcript.

The district judge made some efforts to discourage the jurors from viewing any media accounts bearing on the case. In the preliminary instructions to the jury before trial, the judge gave the following admonition to the jury: "Don't read or listen to anything about this case." Before adjourning for lunch on January 23, the judge asked the jury as a whole if any jurors had "read or seen or listened to anything about th[e] case," and no juror responded. At the end of the day on January 23, the judge reminded the jurors, "Don't forget my instructions about newspapers, TV, radio or discussing the case with anybody." The judge did not, however, accede to the request for individual voir dire made by Garza's defense counsel. The *Street Stories* episode was brought to the judge's attention the next morning before trial resumed, and at the end of the day the judge gave the following admonition:

I've also given you some instructions about not to read anything about the case, not to hear anything about the case, not to watch anything about the case, not to do any investigation on your own about a case—about the case and not to discuss it

with anybody. If through some inadvertence you have seen something about the case or you have read something about it but you—you're clearly not to do that in any way. You cannot consider anything that is not evidence, that has not been presented here in the Courtroom, ladies and gentlemen. And you're under oath to follow the instructions I give you with regard to that.

After some additional prompting by Garza's defense counsel, the judge asked, "None of you have seen or heard anything about this particular case or any defendant in this case recently, have you?" The record reflects that there was no audible response to the judge's question, and he dismissed the jury for the day.

Before the jury was brought into the courtroom on January 27, Garcia's attorney raised the *Monitor* article regarding the property seized during the government raids and the statement given by Eleazar Bermea in conjunction with his guilty plea, and Garza's attorney moved for a mistrial, which the court denied. When the jury was brought in that morning, the judge asked, "Ladies and gentlemen, is there anybody who has seen, read or heard anything about this case since you all were here on Friday?" After getting no audible response, the judge reminded the jury not to forget the instructions he had given, and the trial proceeded. It appears that the judge did not give any final instructions related to the publicity except for general instructions that the jury should restrict its deliberations to the evidence admitted in the case.

Garza argues that the district court should have granted a mistrial because of prejudice stemming from the midtrial publicity, that the district court committed reversible error in failing to conduct midtrial voir dire regarding the publicity, and that the district court committed reversible error for failing to sequester the jury sua sponte. Garcia generally presses the same points.

## B. ANALYSIS

The management of midtrial publicity is entrusted to the broad discretion of the district court; we will reverse only if we find an abuse of discretion. *United States v. Aragon,* 962 F.2d 439, 443 (5th Cir.1992); *United States v. Harrelson,* 754 F.2d 1153, 1163 (5th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241, *and cert. denied,* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

### 1. *Refusal to Conduct Individual Voir Dire*

We consider first the argument that the district judge committed reversible error by failing to voir dire the jurors individually after the instances of midtrial publicity were brought to the court's attention. There is a paucity of Supreme Court authority on the subject of midtrial publicity. The more celebrated cases dealing with the adverse effects of publicity, *e.g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), have involved convictions obtained after massive pretrial publicity and frequently a pervasive media presence during the trial as well. The instant case is not one like *Sheppard* and its kind, as it does not involve a "conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 7035, 44 L.Ed.2d 589 (1975). In *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam), the Court exercised its supervisory power over the enforcement of the criminal law in the federal courts and reversed a conviction because the jurors had been exposed to two newspaper accounts of the defendant's criminal record. The district judge in *Marshall* conducted individual voir dire of the jurors in his chambers and concluded that the defendant would not be prejudiced by the publicity because even the jurors who had read one or both of the prejudicial articles said that they could be impartial in deciding the case. *Id.* at 312, 79 S.Ct. at 1172–73. The Court, although recognizing the district judge's broad discretion in ruling on the possibility of prejudice from the publicity, reversed the conviction and granted a new trial. *Id.* at 312–13, 79 S.Ct. at 1172–73.

■ Although the Supreme Court has not set down many guidelines for resolving the problem of midtrial publicity, we have considered the issue several times in recent years. Our touchstone is *United States v. Aragon*, 962 F.2d at 443–47, in which we undertook a thorough review of our cases regarding midtrial publicity. The test, reduced to its most basic elements, is twofold: voir dire is required if there are serious questions of possible prejudice, considering (1) whether the publicity is innately prejudicial, and if so (2) the probability that the publicity in fact reached the jury. *Id.* at 443–44. In determining whether publicized material is innately prejudicial, we consider factors such as the content of the material, the timing of the publicity in relation to critical stages of the trial, and the possible effects of the material on legal defenses. *Id.* at 444. The second prong is governed by commonsense considerations such as the prominence of the media coverage and the nature, number, and regularity of the district court's warnings against viewing the coverage. *Id.* The test is necessarily highly fact-specific. *Id.* (citing *Marshall*, 360 U.S. at 312, 79 S.Ct. at 1172–73). We have held district courts to a stricter standard in midtrial publicity cases as compared to pretrial publicity cases because information reported during the trial is more likely to remain in the mind of a juror exposed to it. *Id.* at 441 n. 3 (citing *United States v. Williams*, 568 F.2d 464, 468 (5th Cir.1978)).

### a. Nature of the Publicity

■ We first consider whether the publicized material complained of by the appellants was innately prejudicial. In *Aragon*, we reaffirmed the rule that publicity revealing to jurors a defendant's prior criminal record is inherently prejudicial. *Id.* (citing *Williams*, 568 F.2d at 469). We also concluded that a media account was innately prejudicial in the leading case of *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978). In that case, Herring was on trial for various drug offenses. *Id.* at 1100 n. 3. Herring was a road manager for noted rock musician Gregg Allman, and Allman testified at trial against Herring in exchange for a grant of immunity. *Id.* at 1100. The local daily newspaper carried a front-page story, complete with photograph, entitled "ALLMAN UNDER HEAVY GUARD" and subtitled "Death Threats Reported." *Id.* at 1102. We concluded that this material, released on the very day the defendant took the stand, was innately prejudicial and demanded full voir dire of the jurors. *Id.* at 1105. Finally, in *United States v. Williams*, 809 F.2d 1072, 1091–92 (5th Cir.), *modified*, 828 F.2d 1 (5th Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 *and cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216, *and cert. denied*, 484 U.S. 987, 108 S.Ct. 506, 98 L.Ed.2d 504 (1987), we considered midtrial publicity stemming from a government witness's testimony that certain defendants accused of drug offenses were involved in drug dealing even during the trial. This testimony led the trial judge to revoke bail, leading to numerous media accounts of the event, including front page coverage complete with a color photograph of the defendants being led away from the courthouse in chains. *Id.* at 1091. We concluded that the nature of the material "definitely [went] beyond the record and raise[d] serious questions of possible prejudice." *Id.* at 1092.

Most of the publicity that occurred in the instant case was not exceptionally prejudicial; as the district court noted, most of the newspaper accounts were limited to descriptions of the trial proceedings witnessed by the jurors themselves. *See United States v. Martinez–Moncivais*, 14 F.3d 1030, 1037 (5th Cir.1994) (finding that publicity carried no potential for prejudice because "the news media had merely publicized an issue that the jurors had already been informed of by the judge himself"), *petition for cert. filed*, 62 U.S.L.W. 3844 (U.S. June 3, 1994) (No. 93–1933). Two specific instances of midtrial publicity, however, do cause us special concern. First, the newspaper account of Eleazar Bermea's plea agreement, and in particular its detailed recitation of Bermea's admissions regarding the existence and operations of a marijuana trafficking conspiracy, went well beyond what the district judge told the jurors: "Ladies and gentlemen, the case of Mr. Eleazar Bermea has been disposed of, and it will not be necessary for you to return

a verdict of guilty or not guilty with regards to Mr. Bermea." We have made it abundantly clear that evidence about a coconspirator's conviction is not admissible as substantive proof of the guilt of a defendant. *United States v. Leach,* 918 F.2d 464, 467 (5th Cir. 1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 976 (1991); *see also United States v. Griffin,* 778 F.2d 707, 710 (11th Cir.1985) ("Due to the extreme and unfair prejudice suffered by defendants in similar situations, courts and prosecutors generally are forbidden from mentioning that a codefendant has either pled guilty or been convicted."). Indeed, we held in the *Leach* case that the government's introduction of evidence during Leach's trial that Leach's alleged coconspirator had pleaded guilty rose to the level of plain error and warranted reversal of one of Leach's convictions despite his failure to object. *Leach,* 918 F.2d at 468. Thus, the newspaper coverage of Eleazar Bermea's guilty plea and the details of his plea agreement was plainly prejudicial to the remaining defendants. The same article also mentioned certain items seized during a search of Garcia's house, including $110,000 in cash, twenty weapons, and jewelry, that the court had excluded from evidence. Second, the episode of *Street Stories* chronicled public corruption in Starr County and specifically mentioned Garza in conjunction with other prominent Starr County residents who had pleaded guilty or already gone to prison for drug offenses. Although no explicit connection was made between these drug dealers, who included a justice of the peace and a former county clerk, and Garza, Garza's name, photograph, and indicted status were included or described in the broadcast in close proximity to the persons who had pleaded guilty or already gone to prison. We conclude that these two instances of publicity contained material that was innately prejudicial. *See Aragon,* 962 F.2d at 445 (suggesting that publicity is innately prejudicial if its substance "may be taken as probative of the appellants' guilt").

### b. Probability of Jury Contamination

Our analysis must next focus on the likelihood that the prejudicial accounts reached the jury. The most important factors, in our view, are the prominence of the media coverage itself and the measures taken by the district court to minimize the probability of jury exposure. Lesser factors that we have recognized as bearing on the inquiry include whether the jury returned mixed verdicts, which can indicate fair-minded consideration of the evidence, the length of the trial, and the amount of detail provided to the district court regarding the extent and content of the publicity. *United States v. Faulkner,* 17 F.3d 745, 764–65 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 93, —— L.Ed.2d —— (1994).

First, we consider the nature of the publicity itself. All the articles, including the one containing the account of Eleazar Bermea's guilty plea, appeared prominently in what is apparently a leading daily newspaper in the city where the trial was held. As we have already noted, however, the great bulk of the publicity was not particularly prejudicial, and the portion of the article describing Eleazar Bermea's guilty plea consisted of only three short paragraphs in the middle of a longer article. *See United States v. Manzella,* 782 F.2d 533, 541 (5th Cir.) (rejecting a claim based on midtrial publicity in part because the media discussion of a defendant's prior conviction "occupied but one short paragraph in a lengthy article"), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672, *and cert. denied,* 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986). The television program, of course, aired nationally and could have been seen by any of the jurors. On balance, it appears that the prejudicial television broadcast was widely and freely disseminated in a manner likely to reach some jurors, while the prejudicial newspaper story was probably not as likely to come to their attention. *Cf. Aragon,* 962 F.2d at 441–42 (reversing a conviction based on a single article printed conspicuously on the front page of the most widely circulated local daily newspaper); *Williams,* 809 F.2d at 1091–92 (reversing a conviction based on publicity including one front-page newspaper story with photograph and reports on "local television and radio news programs").

The other critical factor in weighing the probability that the jury was exposed to the

prejudicial publicity is the procedure adopted by the district judge to shield the jury from the publicity. The cases place great emphasis on the particular instructions given to the jury by the trial judge to minimize or eliminate the danger of jury contamination by prejudicial publicity. For instance, we declined to reverse convictions due to midtrial publicity in *Faulkner*, 17 F.3d at 764, in part because the judge gave preliminary jury instructions regarding the need to avoid press reports which were "unusually lengthy and emphatic," rather than "boilerplate or casual recitations of standard jury instructions." *Faulkner* involved a television newscast on the first day of trial that erroneously reported that the defendants' first trial had ended in a mistrial caused by jury tampering. *Id.* at 763. We noted with favor the judge's decision to give the jurors an immediate explanation of the real reason for the prior mistrial, which was a hung jury, directly rebutting the allegedly prejudicial statement in the press report. *Id.* at 764. Another approach we have favored is the giving of a blanket instruction to the jury not to view or listen to *any* radio or television news broadcasts or to read any newspapers except as provided by the court, and then to provide newspapers with any relevant portions redacted from them. *Aragon*, 962 F.2d at 445; *Harrelson*, 754 F.2d at 1163.

■ The procedures followed by the district judge in the instant case, however, do not precisely match those used in any of the precedents cited above. The judge did instruct the jury at the outset and occasionally throughout the trial not to read or listen to *any* media accounts of the case, an instruction we have favored over the weaker instruction simply to pay no attention to such accounts. *Herring*, 568 F.2d at 1105. The frequency of the jury admonitions is also a factor we have considered in deciding whether an abuse of discretion has occurred. *Faulkner*, 17 F.3d at 765. In *Aragon*, we reversed appellants' convictions due to midtrial publicity, in part because "a selective prohibition against reading *about the case*, done rather quickly and casually by the court, did not obviate the court's need for inquiry." *Aragon*, 962 F.2d at 445 (emphasis added). In the instant case, the district

judge apparently did not repeat his cautionary instructions each day of the trial, despite the fact that newspaper accounts of the trial appeared several times while the trial was in progress. We observe, however, that the judge did repeat his instructions on a few occasions; significantly, he reminded the jury not to forget his "instructions about newspapers, TV, radio, or discussing the case with anybody" just before dismissing the jury the very day the prejudicial television program aired. We presume that a jury heeds its instructions. *United States v. De La Rosa*, 911 F.2d 985, 992 (5th Cir.1990), *cert. denied*, 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991).

Additionally, even though the district judge did not conduct individual voir dire regarding the publicity, he asked the jury as a whole three times if anyone had been exposed to media coverage of the case. Two of those inquiries were made immediately following the two instances of innately prejudicial publicity that we have already identified, so any contamination would have been fresh in the minds of any jurors that had been exposed to those accounts. The fact that none of the jurors responded to the judge's direct questions strongly suggests that no contamination in fact occurred.

The other factors recognized in the cases have little bearing on this case. Two defendants were wholly exonerated, and Perez and Baldemar Bermea were acquitted on one and two counts of marijuana possession, respectively. Although these mixed verdicts arguably weigh against finding an abuse of discretion in the judge's refusal to conduct individual voir dire, *Faulkner*, 17 F.3d at 764–65, any force this factor might ordinarily carry is substantially diminished in the instant case by the fact that Garcia and Garza, the only defendants to complain about the midtrial publicity, were not acquitted of any charges. The two-week length of the instant trial does not militate strongly for or against reversal, falling as it does between the extremes of the *Aragon* case, in which the problematic publicity occurred in the middle of a two-day trial, and the *Faulkner* case, in which the prejudicial broadcast occurred on the first day of a seven-week trial.

This is a close case, and the more prudent course would have been for the district judge to conduct the requested voir dire and perhaps to provide the jurors with newspapers to read each day with all references to the case expurgated from them. Considering all of the circumstances, however, we conclude that the likelihood of actual jury exposure to the innately prejudicial publicity was so low as to require the conclusion that no abuse of discretion occurred. The most significant fact distinguishing this case from *Aragon* and the other cases finding reversible error is that the district judge did conduct a sort of collective voir dire after both instances of innately prejudicial publicity. The negative response he received on each occasion strongly indicates that jury exposure did not occur in this case and supports his discretionary decision that individual voir dire was unnecessary.

We have found nothing in our cases to support a rule that midtrial publicity requires individual voir dire even after the district judge has made a collective inquiry to the jury and received no positive response. Indeed, in *United States v. Capo*, 595 F.2d 1086, 1092–93 (5th Cir.1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980), we rejected a midtrial publicity claim, basing our decision in part on a collective voir dire of the jury by the court after the publicity was brought to the court's attention. As *Manzella* illustrates, there is no reason to presume, as Garcia and Garza implicitly would have us do, that jurors would conceal their exposure to media coverage from a direct inquiry by the trial judge. *Manzella*, 782 F.2d at 541–42 (approving the trial judge's decision to perform collective voir dire first and then to voir dire individually only the three jurors who indicated they had seen the publicity). Because the collective voir dire indicated that no jury contamination occurred, and because independent factors in this case exist that minimize the likelihood of contamination such as the district judge's instructions to the jury and the obscurity of the prejudicial newspaper account, the district court acted within its discretion in not performing a more searching examination of the jurors individually. *See United States v. Hyde*, 448 F.2d 815, 848 n.

38 (5th Cir.1971) ("[W]hen there has been publicity that would possibly prejudice the defendant's case if it reached the jurors, the court should first ask the jurors what information they have received. Then it should ask about the prejudicial effect and it should make an independent determination whether the juror's impartiality was destroyed."), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); *see also United States v. Davis*, 583 F.2d 190, 196–98 (5th Cir.1978) (finding an abuse of discretion because the trial judge was aware that *all* the jurors had been exposed to media coverage and still performed only cursory collective voir dire asking whether any panel member felt that his impartiality had been impaired). The precautions taken by the district court were sufficient to dispel any serious questions about possible prejudice.

### 2. *Sequestration and Mistrial*

■■■ Garza also contends that the district court committed reversible error by denying his motion for a mistrial due to the midtrial publicity and by failing to order sequestration of the jury sua sponte. This court will reverse a district court's refusal to grant a mistrial only if an abuse of discretion has occurred. *United States v. Limones*, 8 F.3d 1004, 1007 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1543, 128 L.Ed.2d 194, *and cert. denied*, —— U.S. ——, 114 S.Ct. 1562, 128 L.Ed.2d 209 (1994). We have already determined that the district court's decision not to conduct individual voir dire in connection with the midtrial publicity was not an abuse of discretion. By the same token, the court's decision not to declare a mistrial based on the identical publicity was not an abuse of discretion.

■■■ Garza argues that the district court should have sua sponte ordered sequestration of the jury. His failure to request this measure in the district court requires him to show that the court's failure constituted plain error. FED.R.CRIM.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). The Supreme Court has stated that the courts of appeals "should correct a plain forfeited er-

ror affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)); *see* Jeffrey L. Lowry, Note, *Plain Error Rule—Clarifying Plain Error Analysis Under Rule 52(b) of the Federal Rules of Criminal Procedure,* 84 J.CRIM.L. & CRIMINOLOGY 1065, 1072–75 (1994) (discussing the Court's opinion in *Olano* ). This a heavy burden, and one that we conclude Garza has not met. It is well-known that sequestration is one of the most burdensome tools of the many available to assure a fair trial. *United States v. Greer,* 806 F.2d 556, 557 (5th Cir. 1986). Even when error has been preserved, the defendant complaining of a refusal to sequester must demonstrate a substantial likelihood of prejudice flowing from the reversal to sequester before we can find an abuse of discretion. *Id.* at 557–58.

Given our conclusion that the district court's handling of the midtrial publicity was not an abuse of discretion, we cannot conclude that the court's failure to sequester the jury sua sponte rose to the level of plain error.

## IV. EVIDENTIARY RULINGS

■ Garcia contends that two of the district court's evidentiary rulings constituted reversible error. First, he argues that the court erred by admitting extrinsic offense evidence at trial. The district court's decision to admit extrinsic offense evidence under Federal Rule of Evidence 404(b) will not be disturbed absent a clear showing of abuse of discretion. *United States v. Bruno,* 809 F.2d 1097, 1106 (5th Cir.), *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987).

■ The extrinsic offense evidence complained of by Garcia consisted of certain testimony by Gonzalez that tended to show that Garcia had been involved in cocaine trafficking with at least some of the Bermeas prior to the summer of 1988. The substance of this testimony was that Gonzalez encountered Guadalupe Bermea in a bar in the summer of 1988. Guadalupe Bermea complained to Gonzalez that Garcia would not give him $500 that he really needed after he, Baldemar Bermea, and their cousin, Tonio, had made Garcia a millionaire. Gonzalez asked Guadalupe Bermea what he meant, and Bermea responded that he, Baldemar Bermea, and Tonio had helped Garcia ship 2400 "ki's" of cocaine to Los Angeles. Later, Gonzalez asked Garcia about the cocaine trafficking, and Garcia confirmed Guadalupe Bermea's story. Garcia told Gonzalez that Avalos had concealed the cocaine in the hull of a fiberglass boat, Villarreal had driven the boat to Los Angeles, and Guadalupe Bermea, Baldemar Bermea, and Tonio had also been involved. Before Gonzalez's testimony was elicited in the presence of the jury, the district judge conferred with the attorneys and heard Gonzalez's testimony out of the jury's presence. The judge overruled all objections to this testimony and administered a lengthy limiting instruction to the jury during the testimony to consider the evidence of a defendant's other violations of law only in determining "the motive, the opportunity, the preparation, the plan, the knowledge, the identity, and the state of mind or intent with which the defendant may have—the defendant did the act charged in the indictment."

■ Federal Rule of Evidence 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

We review alleged violations of Rule 404(b) under the two-pronged test of *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). That test requires us to verify (1) that the evidence of extraneous conduct is relevant to an issue other than a defendant's character, and (2) that the evidence possesses probative value that is not substantially outweighed by its

undue prejudice and is otherwise admissible under Rule 403. *Id.*

Garcia focuses on the second *Beechum* prong, contending that Gonzalez's testimony about the cocaine trafficking was inadmissible because its prejudicial effect outweighed its probative value. We have held that the mere entry of a not guilty plea in a conspiracy case raises the material issue of intent sufficiently to justify the admissibility of extrinsic offense evidence. *United States v. Parziale*, 947 F.2d 123, 129 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1499, 117 L.Ed.2d 638 (1992); *United States v. Roberts*, 619 F.2d 379, 383 (5th Cir.1980). The second prong of the *Beechum* analysis inquires whether Rule 403 has been satisfied, *Beechum*, 582 F.2d at 913, and we must take care not to infringe upon the "broad discretion," *Parziale*, 947 F.2d at 129, of the trial court regarding the relevance, probative value, and prejudicial effect of evidence. Rule 403 tips the balance in favor of the admission of relevant evidence, permitting exclusion only if the evidence's probative value is *substantially* outweighed by the danger of unfair prejudice. As we observed in *Beechum*, similarity between the elements of the extrinsic offense and those of the charged offense may enhance the probative value of the extrinsic offense evidence. *Beechum*, 582 F.2d at 913. At the same time, a close resemblance between the extrinsic offense and the charged offense also increases the unfair prejudice to the defendant. *Id.* at 915 n. 20. It must also be remembered that the probative value of extrinsic offense evidence is not a constant; if the government already has a strong case on the issue of intent, the extrinsic offense evidence may add little to the government's case and should be excluded more readily. *Id.* at 914.

Although Garcia discusses *Beechum* in his brief at length, he does not explain how *Beechum* or any other case offers him solace on the instant facts; his assertion that the district court not only erred in performing the balancing test of Rule 403 but abused its discretion in so doing is wholly without factual support. We have frequently held in drug offense cases that evidence of a defendant's extrinsic drug offenses is admissible. *E.g.*,

*Parziale*, 947 F.2d at 129; *United States v. Harris*, 932 F.2d 1529, 1534 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 270, 116 L.Ed.2d 223, *and cert. denied*, —— U.S. ——, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991), *and cert. denied*, —— U.S. ——, 112 S.Ct. 914, 116 L.Ed.2d 814 (1992). A bald assertion that the probative value of extrinsic offense evidence was substantially outweighed by its prejudicial effect does not show an abuse of discretion by the district court. *Parziale*, 947 F.2d at 129.

Garcia seems to argue that the district judge committed reversible error because he did not make a determination out of the jury's presence that Garcia committed the alleged extrinsic offense. This proposition is at odds with the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988), in which the Court held that the Federal Rules of Evidence do not require a district court to make a preliminary finding of fact that an alleged extrinsic offense or act has been proved by the government by a preponderance of the evidence. If the court determines, after introduction of the evidence, that the jury could not reasonably find that the alleged extrinsic act occurred by a preponderance of the evidence, however, the court must instruct the jury to disregard the evidence. *Id.* at 690, 108 S.Ct. at 1501–02. Garcia does not challenge the weight of the evidence supporting the extrinsic cocaine conspiracy, he only challenges the lack of a preliminary finding by the court that the extrinsic conspiracy existed. Because such a finding is not required, his challenge is without merit.

Garcia also complains of the court's decision admitting certain evidence seized from his residence in April 1989, approximately nine months after the end of the first conspiracy. The court admitted a document showing Pedraza to be the owner of a truck, an address book containing the names and telephone numbers of some of Garcia's codefendants, and a piece of paper listing names and telephone numbers including "Ruben" and "Onorio." The court did not, we note, admit certain other items that it deemed insufficiently connected to the case. We are

unable to conclude that the district court's admission of this evidence constituted an abuse of discretion and therefore reject Garcia's contention.

## V. PROSECUTORIAL MISCONDUCT

Garcia, Garza, Perez, Rodriguez, and Rogelio Bermea contend that their convictions should be reversed because of prosecutorial misconduct. A criminal defendant bears a substantial burden when attempting to show that prosecutorial improprieties constitute reversible error. *United States v. Diaz–Carreon,* 915 F.2d 951, 956 (5th Cir. 1990). Improper prosecutorial comments require reversal only if the comments substantially affected the defendant's right to a fair trial. *Id.* In evaluating any effect on the right to a fair trial, we consider three factors: the magnitude of the prejudicial effect of the remarks, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt. *Id.* The misconduct complained of must be examined in the context of the trial in which it occurred. *United States v. Willis,* 6 F.3d 257, 264 (5th Cir. 1993). After careful review of the conduct complained of by the defendants and the trial as a whole, we conclude that any misconduct did not substantially affect the defendants' right to a fair trial.

### A. FACIAL EXPRESSIONS

First, Rodriguez and Rogelio Bermea complain that the prosecutor acted sarcastically towards opposing counsel, and specifically that she made improper facial expressions to the jury during cross-examination of government witnesses and during the defendants' closing argument. Only two exchanges between the court and the defense attorney are quoted in the defendants' briefs. In each case, although the court did not directly instruct the jury to disregard the prosecutor's facial expressions, the court did tell the prosecutor not to behave in that fashion. The court also observed that the prosecutor's behavior had actually "been very good in that score." The two isolated instances cited by the defendants, occurring as they did during a two-week trial, do not require reversal of the convictions.

### B. CLOSING ARGUMENT

More serious are the appellants' various charges that the prosecutor used improper closing arguments. The prosecutor must abide by certain limitations in making a closing argument; the prosecutor may not express a personal opinion on the merits of the case or on the credibility of the witnesses, nor may she misstate the jury's function or the burden of proof. *United States v. Cantu,* 876 F.2d 1134, 1138 (5th Cir.1989). We review the specific arguments complained of by the appellants.

Near the beginning of her rebuttal, the prosecutor stated,

Now, Joe Martinez would have you believe that I'm some kind of plaintiff's attorney and I'm looking for money or something like that. Ladies and gentlemen, that's not my job. I represent the people of the United States of America. My job is to take narcotics traffickers off the streets.

Two defense attorneys immediately objected, and Perez's attorney moved for a mistrial, which the court denied. The court remarked that "all she's saying is that she represents the government here." Later, the prosecutor said that Garcia's attorney "talked about 1692 and the Sixth Amendment and Bill of Rights. And touching and feeling and love. Ladies and gentlemen, what we have here is a drug conspiracy before you." Rodriguez and Rogelio Bermea contend that this comment trivialized the law and effectively told the jury that the drug conspiracy laws are more important than the Bill of Rights. Finally, also in her rebuttal, the prosecutor said, "There's never going to be enough evidence for a defense attorney." Perez contends that this last comment impermissibly shifted the burden of proof onto the defense.

We accord wide latitude to counsel during closing argument, and we also give some deference to the district court's determination regarding the prejudicial or inflammatory nature of those arguments. *Willis,* 6 F.3d at 263. Although it is highly improper for a prosecutor to "invoke his personal status as the government's attorney or the sanc-

tion of the government itself as a basis for convicting a criminal defendant," *United States v. Goff,* 847 F.2d 149, 163 (5th Cir.), *cert. denied,* 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988), the district court mitigated the prejudicial effect of the prosecutor's mention of her status as the government's attorney by quickly instructing the jury as follows:

> Ladies and gentlemen I will give you instructions about the government's burden and the government's role with regards to what they have to prove beyond a reasonable doubt and what one of these attorneys says, including [the prosecutor], doesn't change that in any way whatsoever.

We also discount Perez's attempt to characterize an isolated remark by the prosecutor as an effort, much less an effective one, to shift the burden of proof onto the defense. Taken in context, the prosecutor's remark that "[t]here's never going to be enough evidence for a defense attorney" seems to have been meant only to point out that all defense attorneys will argue that the evidence against their clients is insufficient, not that all defendants are guilty. Additionally, just prior to this comment, the district judge had instructed the jury twice in quick succession that the burden of proof never shifts from the government and remains on the government to prove guilt beyond a reasonable doubt.

▬ Garcia and Garza add complaints about a few other prosecutorial arguments during rebuttal. The prosecutor attacked several of the defense attorneys for failing to explain the few pieces of non-testimonial evidence against their clients and for adopting the strategy of attacking the character of the main government witnesses. Garcia and Garza contend that these comments were, at a minimum, indirect references to the defendants' failure to testify. Of course, both direct and indirect comments on a defendant's decision not to testify constitute violations of the Fifth Amendment's guarantee against compulsory self-incrimination. *United States v. Forrest,* 620 F.2d 446, 455 (5th Cir.1980). Certainly the prosecutor could

have summarized the evidence in a way less likely to focus the jury's attention on the defendants' decisions not present any evidence of their own, but merely calling attention to the fact that the government's evidence has not been rebutted or explained is not automatically a comment on a defendant's failure to testify. *United States v. Pitre,* 960 F.2d 1112, 1124 (2d Cir.1992); *United States ex rel. Adkins v. Greer,* 791 F.2d 590, 598 (7th Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 586 (1986). The district judge certainly did not interpret the prosecutor's comments as violative of the guarantee against self-incrimination; on several occasions he responded to defense objections by reminding the jury simply that the burden of proof remained with the government, regardless of the prosecutor's arguments. To hold that a prosecutor's comment is a comment on the defendant's failure to testify, we must conclude that the prosecutor's manifest intention was to comment on that failure or that the comment was such that the jury would naturally and necessarily take it to be such a comment. *United States v. Dula,* 989 F.2d 772, 776 (5th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993). We think this conclusion is not warranted on this record; the judge's instructions would lead the jury away from placing such a construction on the prosecutor's remarks, and in any event the final jury instruction offset any harm by informing the jury that "no inference whatever may be drawn from the election of a defendant not to testify."

▬ Garcia also argues that the prosecutor personally vouched for the credibility of Gonzalez by asserting that government informants are fired if they are found to have lied to law enforcement officers. This argument is meritless. Because no objection to this argument was made, we review only for plain error, which we find lacking. The record makes it plain that the prosecutor merely repeated the testimony of agent Alvarez and did not assert outside knowledge of this policy or of Gonzalez's honesty.[1] *See United*

---

1. Garcia's attorney quotes the offending comment in his brief but conveniently omits the

portion that makes it clear that the prosecutor is only restating agent Almarez's testimony. Such

*States v. Carter,* 953 F.2d 1449, 1461 (5th Cir.) (rejecting a claim based on a prosecutor's praise of DEA agents for their bravery in part because the prosecutor did not imply outside knowledge of their bravery, much less of their truthfulness), *cert. denied,* — U.S. —, 112 S.Ct. 2980, 119 L.Ed.2d 598 (1992). Nor do we accept Garcia's contention that the prosecutor made improperly inflammatory pleas for the jury to act as the conscience of the community. To the extent that she made such a plea, the district judge responded to a defense objection by instructing the jury to consider only the guilt of the individual defendants and not any possible effects of the verdicts on the defendants or anyone else. This was adequate to cure any error.

■ Garza raises one other argument regarding the prosecutor's closing argument that is specific to him. Additional background facts must be recounted in order for us to address his claim.

A search warrant was executed on Garza's residence in April 1989. Among the materials seized was a certificate of deposit (CD) dated August 23, 1988, in the amount of $90,000. This CD was admitted into evidence near the end of the trial, along with some of Garza's income tax returns stating that his adjusted gross income in both 1987 and 1988 was about $23,000. The government's purpose in introducing this evidence, plainly, was to imply Garza's involvement in the drug conspiracies by highlighting the disparity between his declared income and his actual wealth. The prosecutor explicitly drew the connection between the July 1988 drug transaction near Giddings and the purchase of the CD in August 1988 in her closing argument. In his motion for new trial, Garza claimed that the government knew before trial that the money used to purchase the CD did not come from drug transactions, and he attached a DEA report (referred to as a "DEA–6") from May 1989 stating that some $87,000 of the money Garza used to buy the CD came from two checks, one from a Mexican bank and the other from "Merill [sic] Lynch, Pierce/Fender [sic] and Smith Incorporated" in McAllen, Texas.

tactics do not enhance counsel's credibility with

Garza argues that the prosecutor's argument based on the CD was improper because his defense attorney was unaware that the government knew about the source of the funds and nevertheless planned to make a jury argument inviting the inference that the CD was bought with drug proceeds. He also contends that the government withheld the DEA–6 despite his pretrial requests for exculpatory evidence. Garza relies on our opinion in *United States v. Anderson,* 574 F.2d 1347 (5th Cir.1978), in which we stated that "the knowing use by the prosecution of false evidence or perjured testimony which is material to the issues in a criminal trial is a denial of due process. A conviction obtained by the use of such evidence cannot be permitted to stand." *Id.* at 1355 (footnotes omitted).

■ The government responds that Garza's claim is without merit because the prosecutor made no false statements in her closing argument. As the district court observed during the hearing on Garza's motion for new trial, the DEA–6 does not show that the money Garza used to purchase the CD was legitimately acquired, much less that the government knew that the money was legitimately acquired. Indeed, the DEA–6 does not even eliminate the possibility that Garza used the money from the Giddings drug sale (or from some other drug transaction), filtered through financial institutions, to buy the CD. The inference to be drawn from the disparity between Garza's income and his wealth is thus not negated by the DEA–6. Garza has not shown that the prosecutor's comments were based on false evidence. In any event, *Anderson* requires reversal only if the prosecution's use of false evidence creates a reasonable likelihood that the jury's verdict might have been different. *Id.* at 1356. We find no such likelihood on these facts.

Taking the trial as a whole, we conclude that the prosecutor's closing argument does not cast "serious doubt," *Willis,* 6 F.3d at 263, upon the correctness of the jury verdict or the fairness of the trial.

this court.

## C. Miscellaneous Complaints

Rodriguez makes two other complaints about the prosecutor's conduct in the instant case that are without merit. He contends that his counsel requested the prosecution to produce the photo array from which Rodriguez was apparently identified, that the court granted his request, and that the prosecutor disobeyed the court's direction by refusing to provide the array. We have reviewed the pertinent portion of the record and found that the court directed the prosecutor and Rodriguez's defense counsel to confer (apparently out of court) and report back to the court if there was still any disagreement. The district judge told the attorneys that if they did not bring the matter to his attention again "the Court will assume that that's been taken care of." Rodriguez does not call our attention to any subsequent hearing on the matter, so we cannot conclude that this incident involved any prosecutorial misconduct.

Rodriguez's other complaint is that the government used the indictment process in a matter that constituted prosecutorial misconduct. We believe that this claim is more properly analyzed under the speedy trial rubric, which Rodriguez also invokes.

## VI. SPEEDY TRIAL AND APPELLATE DELAY

### A. Speedy Trial Act

Rodriguez contends that the district court erred in overruling his motion to dismiss the third superseding indictment by reason of delay. We review the facts supporting a Speedy Trial Act ruling using the clearly erroneous standard and the legal conclusions de novo. *United States v. Ortega–Mena,* 949 F.2d 156, 158 (5th Cir.1991).

Rodriguez was first named as a defendant (under the name Lencho Ramirez) in the superseding indictment filed on April 23, 1991, and he was arrested and made his initial appearance on May 1, 1991. A new superseding indictment (apparently the third superseding indictment in the case), was filed on November 26, 1991. At the arraignment on this indictment, which took place on December 3, 1991, the presiding magistrate judge noted that the only change wrought by

the new indictment was to expand the alleged length of each conspiracy. Although the government claims that Rodriguez did not move to dismiss the new indictment, the record belies this assertion; on December 16, 1991, Rodriguez filed a motion to dismiss by reason of delay. This motion was denied after a hearing on January 3, 1992. Trial commenced, as we have noted, on January 15, 1992.

The Speedy Trial Act requires that criminal defendants be tried "within seventy days from the filing date ... of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The seventy-day clock will be tolled during certain delays enumerated in § 3161(h). Under § 3161(h)(1)(F), the clock is tolled during any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." The government contends that this provision negates Rodriguez's speedy trial argument.

■ The Supreme Court has held that § 3161(h)(1)(F) tolls the speedy trial clock during all delays between the filing of a motion and the conclusion of the hearing on that motion, regardless of whether the delay in holding that hearing is "reasonably necessary." *Henderson v. United States,* 476 U.S. 321, 330, 106 S.Ct. 1871, 1877, 90 L.Ed.2d 299 (1986). This indefinite exclusion is limited, however, by § 3161(h)(1)(J), which limits to thirty days an exclusion "reasonably attributable to any period ... during which any proceeding concerning the defendant is actually under advisement by the court." Once a hearing has been held on a motion and all necessary additional materials submitted to the court, or once a motion not requiring a hearing is filed along with necessary supporting materials, § 3161(h)(1)(J) limits the excluded period to thirty days. *See Henderson,* 476 U.S. at 329, 106 S.Ct. at 1876 (noting that district courts cannot use § 3161(h)(1)(F) to circumvent the thirty-day limit of § 3161(h)(1)(J)). The fact that pre-

trial motions are pending, standing alone, does not necessarily toll the speedy trial clock indefinitely; the motions must require a hearing under § 3161(h)(1)(F) if indefinite tolling is to occur. *See generally United States v. Johnson,* 29 F.3d 940, 942–43 (5th Cir.1994) (providing an overview of the proper interplay between §§ 3161(h)(1)(F) and (J)).

▮ It appears that we have implicitly agreed with the several circuits that have consistently interpreted § 3161(h)(7) to provide that all defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant and that the excludable delay of one codefendant may be attributed to *all* defendants. *United States v. Neal,* 27 F.3d 1035 (5th Cir.1994) (holding that the clock was tolled from the day the last-arraigned defendant appeared before a judicial officer because "[a]t that time, several Defendants already had filed pretrial motions, and pretrial motions of some type remained pending [for over two years]."); *see also United States v. Arbelaez,* 7 F.3d 344, 347 (3d Cir.1993); *United States v. Butz,* 982 F.2d 1378, 1381 (9th Cir.) (observing that the First, Second, Sixth, Eighth, and District of Columbia Circuits also follow this interpretation), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993); *United States v. Mendoza–Cecelia,* 963 F.2d 1467, 1477 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992); *United States v. Tanner,* 941 F.2d 574, 580 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992). The filing of a superseding indictment does not affect the speedy trial clock for offenses charged in the original indictment or any offense required to be joined under double jeopardy principles. *United States v. Gonzales,* 897 F.2d 1312, 1316 (5th Cir.1990), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 683, 112

L.Ed.2d 675 (1991). The clock continues to run from the original indictment or arraignment, whichever was later, and all speedy trial exclusions apply as if no superseding indictment had been returned. *Id.* This prevents the government from circumventing the speedy trial guarantee through the simple expedient of obtaining superseding indictments with minor corrections. However, motions pending on the charges in the previous indictment continue to toll the clock after the superseding indictment is returned if some of the original charges are retained. *Id.* at 1316–17.

▮ The government relies principally on the *James* [2] motions filed by Rodriguez's codefendants before Rodriguez himself was indicted to toll the speedy trial clock. The record contains a pretrial ruling by the district court filed on March 4, 1991, in which the court ordered *James* motions by Garza, Pedraza, Baldemar Bermea, and Guadalupe Bermea to be carried with the case until trial. The district court ruled on the defendants' *James* motions at trial after the close of the government's evidence on January 27, 1992.[3] The Eleventh Circuit has specifically held that *James* motions will toll the speedy trial clock until trial if the hearing is deferred until trial. *United States v. Phillips,* 936 F.2d 1252, 1254 (11th Cir.1991); *United States v. Garcia,* 778 F.2d 1558, 1562 (11th Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986). It appears, however, that we have never specifically so held in this circuit. In *Johnson,* we held that a pending *James* motion that was never argued or ruled upon, even at trial, did not toll the speedy trial clock beyond the thirty days permitted by § 3161(h)(1)(J). *Id.,* at 945. We recognized that the result might have been different had the trial court held a hearing on the *James* motion immediately before or during trial. *Id.,* at 944 n. 8.

---

**2.** *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

**3.** The court denied the *James* motions. Avalos and Garza make bald assertions that this ruling was in error, but we need not address claims unsupported by argument. *United States v. Ballard,* 779 F.2d 287, 295 (5th Cir.), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916

(1986). In any event, the government satisfied its burden under Federal Rule of Evidence 801(d)(2)(E) to show by a preponderance of the evidence that the alleged conspiracies existed, *Bourjaily v. United States,* 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987), thereby rendering the coconspirator statements complained of admissible.

We must decide the question left open in *Johnson* in the instant case because other pretrial motions and continuances did not sufficiently toll Rodriguez's speedy trial clock to bring him within the seventy-day limit. Several of Rodriguez's codefendants filed motions to suppress evidence prior to Rodriguez's initial appearance. These motions were ultimately heard on September 10, 1991, and the district court denied the last motion to suppress on September 12, 1991. Rodriguez's speedy trial clock thus could not have started to run until September 13, 1991. It did not, however, because Avalos filed a motion in limine on September 11, 1991, which tolled the clock for at least thirty days under §§ 3161(h)(1)(F) and (J). According to the government, the district judge carried this motion to trial and ruled on it on the first day of the trial. Our review of the record, however, shows that the motion was mentioned at the beginning of the trial, but we find no ruling on the motion in the portion of the record cited by the government. Giving Rodriguez the benefit of the doubt, we will presume that the motion in limine tolled the clock for only thirty days. In any event, Rogelio Bermea obtained a continuance, granted by the court under the "ends of justice" provision of the Speedy Trial Act, § 3161(h)(1)(8), on September 23, 1991, resetting the trial for October 15, 1991. Trial did not actually begin then, and the next pretrial motion cited by the government was Rodriguez's own motion to dismiss by reason of delay, filed December 16, 1991. Sixty-one days lapsed between October 15 and December 16, 1991. The motion to dismiss tolled the clock until January 3, 1992, when the motion was denied. Nine more days lapsed before the government filed a motion in limine on January 13, 1992. If we do not consider the *James* motions in our calculus, seventy non-excludable days lapsed before trial began on January 15, 1992, and the Speedy Trial Act was violated.

We have observed that pending motions carried for hearing just before or during trial will toll the speedy trial clock indefinitely. *United States v. Santoyo*, 890 F.2d 726, 728 (5th Cir.1989), *cert. denied*, 495 U.S. 959, 110 S.Ct. 2567, 109 L.Ed.2d 749 (1990). In *Santoyo*, we held that a defendant's motion in

limine tolled the clock for some eight months, even though the district court carried the motion for hearing during trial soon after the motion was filed. *Id.* at 728. In *United States v. Welch*, 810 F.2d 485, 488 (5th Cir. 1987), we held that a defendant's motion to sever tolled the clock for almost two years in the absence of any showing that the defendant had unsuccessfully attempted to receive a hearing. In *Johnson*, we left open the question of whether *James* motions carried until and actually ruled upon during trial could toll the speedy trial clock throughout their pendency. *Johnson*, at 944 n. 8. Confronted with such a case, we agree with the Eleventh Circuit's decisions in *Phillips* and *Garcia*.

We conclude that the pendency of Rodriguez's codefendants' *James* motions tolled the speedy trial clock throughout Rodriguez's prosecution because they were ultimately heard and ruled upon during trial. His Speedy Trial Act claim is therefore without merit.

### B. APPELLATE DELAY

Garza contends that the delay that has occurred between his conviction and the consideration of his appeal has denied him due process. He was convicted in January 1992 and sentenced in May 1992; it appears that his request for the appellate record was not met until some time after June 8, 1993, when Garza's attorney contacted the clerk of this court inquiring into the reasons for the delay. At the time Garza filed his original brief with this court, he asserts, he had already been incarcerated for some twenty-two months.

In *Rheuark v. Shaw*, 628 F.2d 297, 302 (5th Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981), a civil rights action, we recognized that a state could violate due process if it substantially delayed the appellate process it provided for convicted criminal defendants. *See id.* (assuming without deciding that a delay of almost two years between the filing of a notice of appeal and the state's preparation of the appellate record exceeds the limits of due process). The Ninth Circuit has recognized that " 'extreme delay in the processing of an

appeal may amount to a violation of due process'" in the context of federal criminal cases. *United States v. Tucker*, 8 F.3d 673, 676 (9th Cir.1993) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 1230, 127 L.Ed.2d 574 (1994). The factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972), guide our inquiry. Thus, we must consider the length of the delay, the reasons for the delay, the defendant's assertion of his right to appeal, and the prejudice to the defendant occasioned by the delay. *Tucker*, 8 F.3d at 676; *Rheuark*, 628 F.2d at 303 n. 8. In the appellate context, we evaluate the fourth factor by focusing on three types of possible prejudice from appellate delay: (1) oppressive incarceration pending appeal, (2) the anxiety and concern of the convicted party awaiting the outcome of the appeal, and (3) impairment of the convicted party's grounds for appeal or the viability of his defenses in the event of retrial. *Tucker*, 8 F.3d at 676; *Rheuark*, 628 F.2d at 303 n. 8.

 We cannot ascertain with precision the length of the delay in the instant case. Garza filed his notice of appeal in May 1992. His record excerpts contain a letter to the clerk of our court indicating that Garza's attorney had not yet received the record in early June 1993. According to the government, however, the record was forwarded to this court on May 14, 1993. Garza filed his original brief on October 4, 1993, so in any event less than a year and a half passed between the filing of his notice of appeal and his receipt of the record. Although this delay is unfortunate, it is not so excessive as to militate strongly in Garza's favor. *See Tucker*, 8 F.3d at 674 (affirming Tucker's conviction despite a delay of over three years between Tucker's notice of appeal and the completion of the trial transcript).

Moreover, we do not believe that Garza has satisfied the prejudice prong of the test, which has been identified as the most important factor in the analysis. *Id.* at 676. The only claim of prejudice that Garza makes is that he fears the government may destroy certain exculpatory evidence that it did not provide to him before trial. This claim is not persuasive; even if it were, it is not clear

that the delay complained of by Garza is at all connected with the prejudice he asserts. *See Rheuark*, 628 F.2d at 303 n. 8 (observing that the loss of defense witnesses is one type of possible prejudice from appellate delay). We reject Garza's due process claim.

## VII. JUDICIAL MISCONDUCT

 Perez and Garza both complain of judicial misconduct giving the appearance of partiality towards the prosecution. Perez styles his complaint as a due process claim, while Garza argues that the judge's conduct deprived him of the effective assistance of counsel. In both cases, our role is to determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial. *Williams*, 809 F.2d at 1086 (citing *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985)). To rise to the level of constitutional error, the district judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor. *United States v. Samak*, 7 F.3d 1196, 1197–98 (5th Cir.1993); *United States v. Davis*, 752 F.2d 963, 974 (5th Cir.1985); *United States v. Gomez–Rojas*, 507 F.2d 1213, 1223–24 (5th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). The judge's intervention in the proceedings must be quantitatively and qualitatively substantial to meet this test. *Davis*, 752 F.2d at 974.

In his brief, Perez recounts numerous episodes from the trial that he contends illustrate the plain appearance of judicial bias on the part of the district judge. First, the judge interrupted Perez's attorney several times during his opening statement. Next, Perez claims that the judge showed a pattern of bias in favor of the prosecution by sustaining objections before the prosecution even made them. On several occasions, according to Perez, the judge even rehabilitated government witnesses Gonzalez, Gomez, and Solis during the defendants' cross-examination of those witnesses. The judge frequently explained his decision to intervene in the questioning in terms of his concern for efficiency and clarity, and the government

stresses the district judge's authority to control the tone and tempo of a trial and to elicit additional information from witnesses if he believes it would benefit the jury. *United States v. Rodriguez*, 835 F.2d 1090, 1094 (5th Cir.1988).

We begin by dismissing Perez's complaint based on the district judge's occasionally peremptory style of sustaining prosecution objections. Contrary to Perez's suggestion, the trial judge was not in the habit of sustaining prosecution objections without any prompting from the prosecutor herself. Although the judge did sustain several prosecution objections without waiting to hear their legal bases, he generally acted only after the prosecutor had interrupted defense questioning by standing and addressing the court. Additionally, although the frequency of a court's interruptions of defense counsel is significant, the nature of those interruptions is more pertinent to our inquiry. *Williams*, 809 F.2d at 1087. Given the numerous defendants in this case, the district judge's intervention was helpful in keeping the proceedings moving forward and preventing repetition. Moreover, his manner toward the defendants in sustaining these objections was not such as would suggest any departure from neutrality. Nor do we fault the judge's interruption of the opening statement by Perez's counsel, as it appears that the judge intervened simply to prevent counsel from straying into the mode of closing argument.

We next consider the judge's occasional colloquies with government witnesses during cross-examination. When one defense attorney asked Gonzalez if he was the primary source of information for the government agents, Gonzalez answered yes and the prosecution objected. The following exchange occurred:

THE COURT: Objection sustained. How do you know that? Have they told you everybody that they talk to?

GONZALEZ: No, sir, I'm sorry.

THE COURT: Well, then, how—what do you base that answer on?

GONZALEZ: Well, he asked—

THE COURT: Why don't you listen to the questions here?

GONZALEZ: Yes, sir.

THE COURT: He asked you if you were the primary source of the agents. And your answer is what? Are you? And if you are, and you say yes, how do you know that?

GONZALEZ: I don't know that.

THE COURT: Well, then, why did you say yes?

GONZALEZ: I didn't stop to think, sir.

THE COURT: Well, you need to.

GONZALEZ: Yes, sir. Thank you.

Although Perez styles this exchange as rehabilitation of the witness by the court, we find it difficult to perceive how the defense was harmed by the court's tongue-lashing of one of the prosecution's key witnesses. The exchange, which concerned a truly collateral question and answer, seems unlikely to impress a jury with the judge's partiality to the prosecution's cause.

Perhaps more problematic was the following exchange between the court and government witness Gomez. During cross-examination, Gomez appears to have testified (although his testimony is somewhat confusing) that his wife and children had occasionally accompanied a drug-runner named Javier Garcia during previous operations. When asked by defense counsel why he sent his wife and children with Garcia, Gomez answered, "That was stupid on my side." Counsel asked if Gomez did it as a favor, but the judge interrupted and the following conversation took place:

THE COURT: Well, it's stupid, but the reason that you do something like that is because you want people to think that this is an innocent situation, isn't that right?

GOMEZ: That's correct.

THE COURT: Children are used in that situation. It pretends like it's a family outing. Isn't that sometimes the practice that's carried out?

GOMEZ: That's correct, Your Honor.

THE COURT: And that women are less likely to be suspected if they have children with them?

GOMEZ: That's correct, Your Honor.

THE COURT: And that's the reason that you allowed this to happen, and it was planned that way?

GOMEZ: That's correct. I regret it, though.

In Perez's view, this colloquy was highly prejudicial because it made the behavior testified to by the witness appear to be normal; apparently Perez would have preferred to leave Gomez's testimony about the involvement of his wife and children unexplained and thus, presumably, less believable. We do not believe, however, that any substantial prejudicial effect accrued from the judge's intervention. It bears repeating that the district judge "may question witnesses and elicit facts not yet adduced *or clarify those previously presented.*" *Williams,* 809 F.2d at 1087 (citation omitted) (emphasis added).

 Government witness Solis was cross-examined extensively about his 1989 guilty plea in federal district court for his role in transporting marijuana during the second conspiracy. Solis testified that when he pleaded guilty he did not tell the court about the involvement of his coconspirators, and Perez's defense counsel got Solis to admit that he had probably lied under oath in so doing. Later, Rogelio Bermea's attorney returned to this subject and tried to get Solis to admit that he had been under oath each time he met with the judge before whom he had pleaded guilty. At this point the district judge intervened and asked Solis if he had been placed under oath only at the time of his plea and not at sentencing, to which Solis agreed. The judge went so far as to "take judicial notice of the fact that when we sentence individuals we don't place them under oath." Again, this appears to have been a rather collateral matter, and the judge's intervention seems designed to clarify the witness's somewhat confused testimony about events three years earlier rather than to bolster the prosecution's case or to convey to the jury a desire to thwart the defense's efforts. During cross-examination by still a third defense attorney, the judge again inter-rupted to explain the normal procedures followed at sentencing when Solis had difficulty remembering. We do not consider the judge to have overstepped his role in ensuring the clarity of the evidence for the jury's scrutiny. Even though the judge arguably cut off a possible avenue of impeachment, the value of impeaching Solis on the intricacies of the procedures attendant to a guilty plea could not have been great. The manner in which the judge undertook the explanation was not overtly hostile to the defense or favorable to the prosecution.

 Finally, Perez complains that the district judge actively rehabilitated Solis after Garza's defense attorney got Solis to contradict his previous testimony regarding letters Solis had sent to the Bermeas from jail asking for money. After Solis admitted that he had lied on the previous day during his testimony, the judge stepped in and asked Solis why he had lied; Solis then retreated and said he had simply gotten confused. We do not consider this incident sufficiently egregious to warrant reversal. As the judge noted, Solis's testimony the previous day had been elicited by the judge himself, and that testimony was more equivocal than Garza's attorney represented in his cross-examination; the judge was therefore within his prerogative to clarify the proceedings for the benefit of the jury. In any event, the jury witnessed Solis's self-contradiction to the extent it actually occurred and could use that fact in assessing his credibility if it chose to do so.

Additionally, we note that the district judge took care to give an accurate jury instruction regarding his role in the proceedings. He observed that he had occasionally made comments to the lawyers and asked questions of the witnesses, and he instructed the jury not to assume from any of his actions that he had any opinion about the facts of the case. The judge went on to state, "Except for my instructions to you on the law, you should disregard anything I may have said or done during the course of the trial, in arriving at your findings as to the facts." We have held that a curative instruction such as this one can operate against a

finding of constitutional error. *Samak*, 7 F.3d at 1198 (citing *Davis*, 752 F.2d at 975).

Having reviewed all the incidents complained of by Perez in the context of the entire trial and jury instructions, we conclude that the district judge's actions in handling the trial did not stray so far from neutrality as to cast any doubt on the ability of the jury to consider Perez's case without a predisposition towards a finding of guilt. The intervention that did occur was not such as would have caused jury confusion regarding the roles of judge and prosecutor.

 Garza contends that the judge prevented his defense counsel from effectively cross-examining and impeaching the government's witnesses on several occasions. Having reviewed the pertinent portions of the record, we are in general agreement with the government that the district judge for the most part intervened only when necessary to prevent repetition and that Garza's attempts to impeach the government witnesses were not unduly hampered. Garza complains that he was not allowed to publish to the jury a signature he procured from Solis during trial for purposes of comparison, but the judge simply held that defense exhibit along with all other exhibits for the jury's inspection when they began deliberating. Finally, Garza complains of Solis's testimony that Solis's brother had told him that Garza wanted to pay Solis not to testify, but as the district judge pointed out at the time it was Garza's own attorney that inadvertently coaxed Solis to testify in this manner. The incident did not involve judicial misconduct. Garza's judicial misconduct complaints are without merit.

## VIII. SEVERANCE

 Rodriguez and Rogelio Bermea contend that they were improperly joined in the same indictment as their codefendants and that the district court erred in denying their motions for severance. They have waived any argument, however, that their joinder was improper under Federal Rule of Criminal Procedure 8(b). We have noted that a claim of misjoinder under Rule 8 is conceptually distinct from a claim that the district court should have granted a sever-

ance under Rule 14. *Manzella*, 782 F.2d at 540. Neither appellant has provided a citation to the portion of the record (assuming that one exists) in which the misjoinder argument was presented to the district court. Typically, we will not consider on appeal matters not presented to the trial court. *Quenzer v. United States (In re Quenzer)*, 19 F.3d 163, 165 (5th Cir.1993). In any event, Rodriguez and Rogelio Bermea do not argue that they were misjoined in the argument sections of their briefs, but instead confine their arguments to the district court's denial of their motions for severance. We will confine ourselves to the severance argument actually presented in their briefs. *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir.), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). Garza also makes an argument that he was entitled to a severance; his complaint, however, focuses on the joint trial of the two conspiracy charges against him rather than on the joint trial of all the defendants in this case.

 We review the denial of a motion for severance for abuse of discretion. *United States v. Castro*, 15 F.3d 417, 422 (5th Cir.1994), *petition for cert. filed* (U.S. May 27, 1994) (No. 93–9334); *United States v. Arzola–Amaya*, 867 F.2d 1504, 1516 (5th Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). If defendants have been properly joined, the district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence. *Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *Castro*, 15 F.3d at 422. Any prejudice created by a joint trial can generally be cured through careful jury instructions. *Castro*, 15 F.3d at 422.

### A. RODRIGUEZ AND ROGELIO BERMEA

 Rogelio Bermea does not persuade us that any of his specific trial rights were compromised by the joint trial or that the jury was prevented from making a reliable determination of his guilt or innocence.

He cites only two incidents of the joint trial as probative of prejudice to his defense. First, he complains that Garza's defense counsel prejudiced his trial rights by spending a large part of his cross-examination "on restating testimony against Rogelio Bermea." Even if this were true, we would be hard-pressed to find any great prejudice against Rogelio Bermea from this fact alone; in any event, our review of the record belies this assertion. Second, Rogelio Bermea argues that he was greatly prejudiced by being tried jointly with three family members (including Eleazar Bermea, who pleaded guilty during the trial). As we have already seen, however, the jury was able to draw distinctions among the Bermea defendants, acquitting Baldemar Bermea of two of the three counts against him. The district judge, we also note, was careful to require the prosecution to specify which Bermea was being discussed by government witnesses during their examinations. The jury instructions also reduced any prejudice to Rogelio Bermea from the joint trial.[4]

Rodriguez complains that he was prejudiced by the joint trial because of the tactics adopted by counsel for his codefendants. He claims an exchange between Gonzalez and Rogelio Bermea's defense counsel, in which Bermea's counsel expressed disgust with Gonzalez's profession and asked Gonzalez if he was a "sneaky, sleazy liar", left the jury with the impression that the defense table was in complete disarray. He also complains about an objection made by Garza's defense attorney during his own counsel's closing argument. These incidents, however, were minor when viewed in the context of the whole record and did not put Rodriguez's trial rights at serious risk. The objection to Rodriguez's counsel's closing argument, in particular, was harmless because his counsel was merely prevented from showing the jury a copy of a report from a law enforcement agency, and not from arguing the contents of that report.

Rodriguez also focuses on language in *Zafiro* in which the Court recognized that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice is heightened." *Zafiro*, —— U.S. at ——, 113 S.Ct. at 938. We reject this argument as well. This case, although involving numerous defendants, did not involve particularly complex facts. Nor does Rodriguez's alleged lesser involvement in the drug trafficking mandate severance. Both Gomez and Gonzalez testified that Rodriguez substantially participated in the July 1988 shipment of marijuana for Garcia, and the evidence against Rodriguez was not significantly less than the evidence against some of the other defendants involved in that transaction. In any event, "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify a severance.'" *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218, *and cert. denied,* —— U.S. ——, 114 S.Ct. 560, 126 L.Ed.2d 460 (1993). Nor do we find any "spillover effect" severe enough to warrant reversal. Rodriguez complains of certain extrinsic offense evidence admitted at trial regarding an earlier cocaine-trafficking conspiracy involving Garcia, Guadalupe and Baldemar Bermea, Avalos, and others. Rodriguez was not mentioned in connection with this scheme, however, and we presume that the jury followed its instructions to consider the case against each defendant "separately and individually." *See id.* at 1483 & n. 36.

We conclude that any prejudice suffered by Rogelio Bermea and Rodriguez as a result of the joint trial was not substantial enough to warrant a finding of abuse of discretion. Moreover, any prejudice was sufficiently cured by the district court's instructions to the jury.

### B. Honorio Garza

Garza complains that the district court abused its discretion by refusing to

---

4. Rogelio Bermea also raises a claim of ineffective assistance of counsel. We conclude that this case is appropriate for application of the general rule in our circuit that such claims cannot be resolved on direct appeal unless first raised in the district court. *United States v. McCaskey,* 9 F.3d 368, 380 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). The record is not sufficiently developed with respect to the merits of the claim to justify an exception. Bermea remains free to pursue his claim in accordance with 28 U.S.C. § 2255.

sever the two conspiracy counts against him. We may reverse only on a showing of clear prejudice from the court's decision. *United States v. Fortenberry*, 914 F.2d 671, 675 (5th Cir.), *reh'g denied with opinion*, 919 F.2d 923 (5th Cir.1990), *cert. denied*, 499 U.S. 930, 111 S.Ct. 1333, 113 L.Ed.2d 265 (1991). "Clear prejudice may result when the jury is unable to separate the evidence and apply it to the proper offenses, or where the jury might use the evidence of one of the crimes to infer criminal disposition to commit the other crimes charged." *Id.* Garza contends that the similarities between the two conspiracies created a high probability of jury confusion, as well as a strong possibility that the jury would use the stronger evidence connecting Garza with the first conspiracy to convict him of the second as well.

We reject Garza's contention. Although the conspiracies were quite similar in many respects, they were distinct in time and involved different participants. As our statement of the facts, *supra* Part I.A, illustrates, the evidence at trial was fairly easy to separate as relevant to either one conspiracy or the other. Jury confusion was not unusually likely. The district judge carefully instructed the jury that "[e]ach offense and the evidence pertaining to it should be considered separately and individually." The mixed verdicts returned with respect to Perez and Baldemar Bermea demonstrate that the jury was not confused. Considering all the circumstances, we conclude that Garza has not shown that he suffered any more prejudice than inevitably inheres whenever "'multiple charges are jointly tried.'" *United States v. Rocha*, 916 F.2d 219, 229 (5th Cir.1990) (citation omitted), *cert. denied*, 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991).

## IX. MOTION FOR NEW TRIAL

 Garza complains of the district court's decision denying his motion for a new trial. He relies almost entirely on claims that we have already discussed. For instance, he again complains that the government failed to provide him with a copy of the DEA–6 report that described the source of the funds he used to buy the $90,000 CD. As

the government points out, this information was available to Garza both before and during trial, so even if Garza's attorney did not receive the DEA–6 report (which the prosecutor contested) Garza's ability to impeach agent Alvarez or rebut the prosecutor's closing argument was not impeded. To the extent Garza is raising a *Brady* claim, it is without merit. *See Dula*, 989 F.2d at 775 n. 9 (noting that *Brady* does not oblige the government to provide defendants with evidence that is equally available to the defense and the prosecution).

 Garza does raise one new argument, claiming that the government failed to establish the chain of custody with respect to certain telephone records introduced into evidence. Garza's defense counsel questioned the records custodian called by the government to introduce the records and elicited from her the admission that she did not know whether the records had been maintained in their original form or altered in any way. The custodian did, however, verify that the records were business records within the definition of Federal Rule of Evidence 803(6) and that they were accurate when made. Evaluating the admissibility of evidence, of course, is a matter within the sound discretion of the trial court. *United States v. Sparks*, 2 F.3d 574, 582 (5th Cir.1993), *cert. denied*, ─── U.S. ───, 114 S.Ct. 720, 126 L.Ed.2d 684, *and cert. denied*, ─── U.S. ───, 114 S.Ct. 899, 127 L.Ed.2d 91, *and cert. denied*, ─── U.S. ───, 114 S.Ct. 1548, 128 L.Ed.2d 198 (1994). Because any break in the chain of custody goes to the weight of the evidence rather than its admissibility, *id.*, we conclude that Garza has not shown an abuse of discretion in the evidentiary ruling or error in the denial of his motion for new trial.

## X. SENTENCING

Several appellants challenge the sentences imposed by the district court. Because they were sentenced on May 12, 1992, the district court applied the version of the federal sentencing guidelines effective from November 1, 1991, through October 31, 1992. *See United States v. Mills*, 9 F.3d 1132, 1136 n. 5 (5th Cir.1993) (noting that a sentencing court must apply the version of the guidelines ef-

fective at the time of sentencing unless application of that version would violate the Ex Post Facto Clause of the Constitution).

## A. DRUG QUANTITIES

 Avalos, Pedraza, Guadalupe Bermea, and Baldemar Bermea contend that the district court erred in calculating the drug quantities attributable to them under the sentencing guidelines. The amount of drugs for which an individual shall be held accountable represents a factual finding that must be upheld unless clearly erroneous. *United States v. Maseratti,* 1 F.3d 330, 340 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1096, 127 L.Ed.2d 409, *and cert. denied,* — U.S. —, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Drug conspirators are accountable not only for the quantities of drugs they actually possessed but also for the foreseeable acts of their coconspirators committed in furtherance of the conspiracy. United States Sentencing Commission, *Guidelines Manual,* § 1B1.3(a)(1) (Nov. 1991).[5]

### 1. *Avalos and Pedraza*

The sum and substance of the argument made by these two appellants (who share the same counsel on appeal) is as follows: "The Court erred in not granting defendant's objections to the Presentence Investigation Report and finding that the amount was 3,800 pounds of marihuana instead of 1,800 pounds

as shown by the testimony." The presentence investigation reports (PSRs) prepared for Avalos and Pedraza contained the following paragraph:

> According to the [confidential informant], he learned by conversing with Pepe Villarreal and others, that Manuel Garcia had previously transported two or three other marihuana loads for Honorio Garza. These loads, which were transported within the timespan of the conspiracy cited in Count 1, involved approximately 1,000 pounds of marihuana per load. The defendants who participated in the delivery of the 1,800–pound marihuana load also took part in the transportation of the aforementioned loads. Later, another [confidential informant] corroborated the information concerning the previous loads.

Thus, the PSR recommended a base offense level for both Avalos and Pedraza of thirty-two, based on a drug quantity of 3800 pounds (roughly 1720 kilograms) of marihuana. The district court adopted the drug quantities recommended in the PSRs, but it granted both Avalos and Pedraza a two-level reduction for minor participation in the conspiracy against the recommendations of the PSRs.

 The trial testimony was clearly sufficient to support a finding that 1800 pounds of marijuana should be attributed to Avalos and Pedraza based on the July 1988 shipment of marihuana to Shorty Pedraza's residence in Giddings. The question is whether the district court clearly erred in "tacking on" an additional 2000 pounds of marijuana based on alleged prior shipments. We recall that a PSR generally bears sufficient indicia of reliability to be considered by the trial court as evidence in making the factual determinations required by the sentencing guidelines. *United States v. Gracia,* 983 F.2d 625, 629 (5th Cir.1993); *United States v. Robins,* 978 F.2d 881, 889 (5th Cir.1992).

 As we noted in the recitation of facts, Part I.A.1 *supra,* Gomez testified that Garcia used Gomez's ranch as a loading site ten or twelve times between January and

---

5. All citations to the sentencing guidelines are to the version effective November 1, 1991, unless

otherwise indicated.

August 1988. Gomez clearly testified that Avalos was present on several of those occasions and that Avalos was Garcia's "next in command." Given the fact that the secret compartment used to hold the marijuana was capable of holding at least 1800 pounds of the drug, we conclude that the district court did not clearly err in assigning Avalos 3800 pounds of marijuana for sentencing purposes. The evidence connecting Pedraza with the earlier shipments is more tenuous but still sufficient. Gonzalez testified that he met Pedraza at Garcia's ranch in "early '88"; he further testified that Pedraza told him on one occasion that he was the owner of the truck used to transport the marijuana and that Garcia was paying him in installments for the truck. Avalos and Garcia also told Gonzalez that the truck was registered in Pedraza's name, and Pedraza told Gonzalez that Garcia paid him $25 per pound of marijuana to arrange for storage at Shorty Pedraza's residence. Gomez testified that the truck was actually registered under Pedraza's wife's name and that he saw Pedraza at Shorty Pedraza's residence "a couple of times." Taken as a whole, the evidence prevents us from concluding that the district court committed clear error as to the drug quantities ascribed to Avalos and Pedraza.

### 2. Guadalupe and Baldemar Bermea

▮ The PSRs prepared for Guadalupe and Baldemar Bermea recommended a finding that 5496 pounds (roughly 2490 kilograms) of marijuana were attributable to each for sentencing purposes. Such a finding results in a base offense level of thirty-two. The district court accepted this quantity calculation but gave both Guadalupe and Baldemar Bermea a two-level reduction for minor participation. The Bermeas contend that the evidence supporting this quantity calculation was insufficiently reliable to be relied upon by the district court at sentencing. They also contend that the court erred by attributing to each of them the entire amount of drugs involved in the second conspiracy rather than the amount of drugs each agreed to conspire to possess with intent to distribute.

At sentencing, the district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Reasonable reliability is all that is required by § 6A1.3(a). *United States v. Rogers*, 1 F.3d 341, 344 (5th Cir.1993). Guadalupe and Baldemar Bermea do not explain why the information relied upon by the district court and the probation officer who prepared the PSRs was unreliable. Law enforcement agents confirmed some 2400 pounds of the 5496–pound total because they seized 2400 pounds of marijuana from the trucks driven by Gonzalez and Solis. The remaining 3000 pounds was based on an interview conducted with Solis after his arrest, in which he told a DEA agent that he had made three successful shipments of over 1000 pounds each before he was arrested during the fourth shipment. This was not far afield from Solis's testimony at trial, which indicated that one load was actually about 950 pounds, another was about 1300 pounds, and the third was at least 1000 pounds based on the amount Solis was paid by Rogelio Bermea. This information satisfies the low threshold of reliability established by § 6A1.3(a). Indeed, that section permits consideration of out-of-court declarations by an *unidentified* informant if there is good cause for the nondisclosure of the informant's identity and there is sufficient corroboration of the information by other means. U.S.S.G. § 6A1.3 comment. The Bermeas' complaint is without merit.

▮ The Bermeas' other argument is based on amendments to § 1B1.3 and its commentary that took effect on November 1, 1992, after their sentencing. Although the revised guidelines are not applicable to defendants sentenced prior to that date, we have nevertheless referred to them for guidance in cases such as the one at bar because they were intended only to clarify what the guidelines already provided. *Maseratti*, 1 F.3d at 340. The Bermeas particularly rely on illustration (c)(7) to the new § 1B1.3:

Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S

knows that R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to the distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R.

U.S.S.G. § 1B1.3 comment. (illus. (c)(7)) (Nov. 1992).

The government responds that the Bermeas' argument is without merit because both Baldemar and Guadalupe Bermea were direct participants in the entire marihuana trafficking conspiracy. Both were implicated in the shipment driven by Gonzalez, and both were substantially implicated by Solis as active participants in the conspiracy throughout Solis's tenure as a driver for the Bermeas. Guadalupe and Baldemar Bermea do not provide us with sufficient basis in the record to reverse the district court's findings that both men were accountable for all the drugs possessed during the course of the conspiracy. *See* U.S.S.G. § 1B1.3 comment. n. 2 (Nov. 1992) ("With respect to offenses involving contraband (including controlled substances), the defendant is accountable for ... all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.").

### B. Acceptance of Responsibility

 Guadalupe Bermea contends that the district court erred in denying him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). The defendant bears the burden of demonstrating to the sentencing court that he is entitled to a downward adjustment for acceptance of responsibility, and we review the sentencing court's acceptance of responsibility determination with even more deference than under the pure clearly erroneous standard. *United States v. Watson*, 988 F.2d 544, 551 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 698, 126 L.Ed.2d 665 (1994); *see* U.S.S.G. § 3E1.1 comment. n. 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review.").

 Bermea does not contend that he "clearly demonstrate[d] a recognition and affirmative acceptance of personal responsibility for his criminal conduct," § 3E1.1(a); he contends only that the denial of the reduction violated his constitutional privilege against self-incrimination. The same argument was made in *United States v. Singer*, 970 F.2d 1414, 1420 (5th Cir.1992) ("Singer contends that the Sentencing Guidelines' acceptance of responsibility provision impermissibly requires individuals to admit guilt in order to receive a sentence reduction."). We rejected that claim. *Id.; see also United States v. Mourning*, 914 F.2d 699, 707 (5th Cir.1990) ("The government is permitted to reward contrition. This is not the same as compelling self-incrimination."). Bermea's argument is without merit.

### C. Ex Post Facto Clause

 Baldemar Bermea contends that his sentence was imposed in violation of the Constitution because the conspiracy for which he was convicted began prior to the November 18, 1988 amendment to 21 U.S.C. § 846. He argues that the amendment increased the maximum punishment for the offense of conspiracy to possess marijuana with intent to distribute and that this increased punishment cannot constitutionally apply to him under the Ex Post Facto Clause. U.S. Const. art. 1, § 9.

Bermea's contention is without merit. We have recognized that an increase in sentence based on an amendment effective after an offense is committed would be a clear violation of the Ex Post Facto Clause. *United States v. Thomas*, 12 F.3d 1350, 1370 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 1861, 128 L.Ed.2d 483, *and cert. denied*, —— U.S. ——, 114 S.Ct. 2119, 128 L.Ed.2d 676 (1994). Conspiracy, however, is a continuing offense. If there is evidence that the conspiracy continued after the effective date of the amendments, the Ex Post Facto Clause is not violated by sentencing under the amendments. *Id.* at 1370–71. The evidence that the second conspiracy continued after

November 18, 1988, is substantial. If it was foreseeable to Bermea that the second conspiracy would continue past the effective date of the amendments, he can avoid being sentenced under those amendments only if he withdrew from the conspiracy by taking affirmative acts that are inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach other conspirators. *Id.* at 1371; *United States v. Devine,* 934 F.2d 1325, 1332 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 349, 116 L.Ed.2d 288 (1991), *and cert. denied,* —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 811, *and cert. denied,* —— U.S. ——, 112 S.Ct. 952, 117 L.Ed.2d 120, *and cert. denied,* —— U.S. ——, 112 S.Ct. 954, 117 L.Ed.2d 121, *and cert. denied,* —— U.S. ——, 112 S.Ct. 1164, 117 L.Ed.2d 411, *and cert. denied,* —— U.S. ——, 112 S.Ct. 1197, 117 L.Ed.2d 437 (1992). Bermea cannot prevail on his Ex Post Facto Clause argument merely by asserting that his participation in the second conspiracy was not shown to have continued after November 18, 1988. *United States v. Puma,* 937 F.2d 151, 158 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1165, 117 L.Ed.2d 412 (1992).

We have treated a district court's decision to sentence a conspirator under amendments that became effective during the conspiracy as a factual finding subject to review only for clear error. *Thomas,* 12 F.3d at 1371. Bermea has not shown such error to exist. His argument is meritless.

XI. CONCLUSION

For the foregoing reasons, we AFFIRM the judgments below.